Good morning, Your Honors. My name is Dennis Brager. I'm here on behalf of the appellant petitioners Charles and Elizabeth Fargo. If it pleases the Court, I'd like to reserve about six minutes of my time for rebuttal. The issue here is whether the IRS abused its There are two prongs to this. The tax court should have reversed the IRS if it abused its discretion, either because the payment of the full amount due would have caused an economic hardship to the Fargos, or alternatively, the IRS should have abated interest based upon the 15-year long-standing delay in determining the amount of tax due. I'd like to address the long-standing delay issue first. We believe that the IRS and the tax court have raised a straw man. Throughout the IRS's brief, the tax court's opinion, it focuses on whose fault the delay was and the fact that the delay was not the fault of the IRS, and therefore, there shouldn't be an abatement of interest. The tax court did not discuss the legislative history. Do you request an abatement of interest, or did you make an offer of settlement? Because I don't think you requested an abatement of interest. We did not request an abatement under Section 6404. What we request was an offer in compromise on so-called effective tax administration grounds. Under the regulations, those effective tax administration offer can be granted either because there's economic hardship or on grounds of public policy, equity, et cetera. The legislative history to the 1998 Act, which created ETA, or effective tax administration offers, explained that it expected that the IRS would grant offers in compromise in cases where penalties and interest had accumulated due to a longstanding delay in determination of the amount of tax due. Who wrote the legislative history? This was the conference committee report. Who wrote it? A senator? A member of the House? Did it ever go to the floor for a vote? No, it didn't. You look first to the statute, and if the statute provides relief for you, you get it? The statute is ambiguous. The statute doesn't say a whole heck of a lot other than the fact that it broadens the grounds upon which offers can be allowed. Next, you look to the regulations that are adopted by the commissioner with the authority of the Congress, right? That's true, Your Honor. The source you have now is written by somebody somewhere along the legislative process line, and it's never enacted. I used to write it, Judge Fieser. What? I used to write it when I was on the staff of the Secretary of the Treasury. Did you write this one? Yes. Staff people write it. I think that this is, as I say, an extremely ambiguous statute. I also think that the State did not argue in our brief that the regulations should be invalidated. We believe that the regulations, as they stand, would allow for the relief that we requested. What we complain about is the IRS refusal to look at longstanding delays, other than in cases where the delay would have allowed relief under Section 6404, and we believe that by doing that, they've completely ignored Congress's desire. And I think what you can look at is there's a long history here, going back to 1986. In 1986, Congress changed the law for the first time to allow for abatements of interest, reductions in interest, where there was a, quote, ministerial delay on the part of the IRS. Ten years later, Congress was able to reduce that ministerial delay and, in fact, expanded it to something called managerial delay or error. Two years later, in 1998, the Senate held hearings. It was concerned about abuses by the Internal Revenue Service. As part of the reforms they passed, they passed this change in the offer provision, and in the legislative history, they indicated what they had in mind. Also as part of that same change in 1998, Congress passed a provision that specifically said that in cases going forward, if the IRS couldn't make an audit determination within a year, within 18 months, later changed to a year, that interest would simply stop until the IRS could complete its job. So what, and there's, what I see here is a, just a long continuum, which makes very clear what Congressional, the Congressional desire is, and that's to relieve the suffering of, of taxpayers who get these huge amounts of interest assessed against them, which are out of all, out of all proportion to the original tax. In this case, the interest was four times the amount of tax that, that was imposed. Well, what date do you contend the IRS should have made the determination of your liability plus interest? We believe that it would be, that a reasonable amount of time for this to have taken would have been approximately six, six to seven years from the time that the, the returns were originally filed. So around 1991. Now, if that had happened, how much interest would you have owed? I don't have the, the exact calculations. Because I'm just wondering, your offer of compromise seemed awfully low. It seemed like if, even if you had, if they made the determination at the point where, where you think they should have made the determination, the interest had run, I mean, they have a pretty high rate of interest, granted, but it would, the interest would be much higher than the offer that you made in any event. And I think that, that was part of the negotiation process that we expected to occur once the IRS agreed to the, to the principle. The principle being, not the principal amount of the tax due, but the, the concept. But there's nothing in the statute that requires the IRS to negotiate. It is guided by, by the Internal Revenue Manual in this regard, which we mentioned in the law. It's true that it's not the law, Your Honor. But, in fact, in these type of collection due process cases, the courts have routinely looked to the Internal Revenue Manual to determine whether or not the IRS abused its, its discretion. So you're, you're absolutely correct. It's, it's, it's not the law. But, but the courts have certainly looked at that to determine what's reasonable or not reasonable in terms of the IRS actions. You know, it's, it's, it's not simply my view as to what the, the legislative history is or what Congress desired. This has also been set forth by the taxpayer advocate. The taxpayer advocate is charged by the Congress with looking after the interests of all taxpayers. And she filed a report, again cited in our briefs, indicating that she felt that, that the IRS was not complying with the Congressional intent in, in implementing these changes in, in, in the offers. She referred to the IRS's refusal to accept offers based upon long, longstanding delay as being troublesome. And she also noted that the IRS's interpretation of the law not to permit ETA offers in cases of, in cases that did not qualify under Section 6404 as ignoring the legislative history and making it superfluous. Let me move on to the economic hardship issue. And this is, again, an independent ground. The tax court summarily dismissed the taxpayer's economic argument in two sentences, indicating that on the record, although the taxpayers had presented a, quote, legitimate view of their possible future needs, the, it determined that the, that there was no abuse of discretion by the IRS. In my view, this is a relatively simple mathematical exercise. There, there are four or five facts, which I don't think are fairly in dispute. Mr. Fargo had been diagnosed with a progressive and deteriorating dementia, which his doctor said would result in his being unable to care for himself. The taxpayer submitted an estimate of those costs based upon publicly available figures, indicating the costs could run as much as $90,000 a year, and indicating that those costs were going to increase at a rate faster than inflation. An additional fact is the taxpayer's assets, not including their home and cars, was $851,000. And the, it's also a fact that the IRS appeals officer never disputed the amount of the taxpayer's assets, never disputed the cost of the nursing home care, never disputed the diagnosis. All the underlying facts were not, were not disputed by the appeals officer. And he apparently made his decision on the basis of those facts. And the tax court never disputed that these facts were incorrect. And if you simply do the math, at $90,000 a year, those assets are going to, will evaporate in ten years. So I think it was a true abuse of discretion for the IRS to conclude, and the IRS has not asked the tax court to conclude, that there was no significant economic hardship to these individuals. If there are no further questions, I'm going to sit down for the moment. Good morning. May it please the Court, Randolph Hutter for the Commissioner of Internal Revenue. Taxpayers seem to want to challenge the IRS on a rather grand scale in this case. But, of course, this appeal is limited to the particular facts in this case. And those facts are the taxpayers submitted an offer of $7,500 to settle an interest liability of over $100,000. As you pointed out, that the IRS doesn't have an obligation to enter into negotiations. I find it astounding that once the offer was refused, the taxpayers never made any kind of offer. Rather, they appealed from the decision not to accept the $75,000. As a practical matter, and given the goals of this Act, why didn't the IRS sit down with the plaintiffs and just try to negotiate? I mean, after all, that's a huge amount of interest based on what the actual liability was. I mean, you have no legal obligation to do it, but you could have resolved this a lot easier than ending up in the Court of Appeal. I can't look into the minds of those that handled it then, but I can give some justification for why this interest liability shouldn't be settled. And that is that the idea behind the legislation and the regulations is that the compromises offers should promote efficient tax administration, and that offers should be looked to in terms of the equities and in terms of what's going on that the taxpayers refer to, refer to certain circumstances in which offers can be accepted. And these circumstances involve taxpayers who invested in abusive tax shelters, extremely complicated partnerships, which invested in other partnerships. It's a multi-tier situation. Of course it's going to involve a long period of time, and it's not the IRS's job to ensure that taxpayers don't have to pay additional interest, just the time value of money, because those investigations are going to go on so long. And the investigation in regard to the first, the underlying partnership involved, resulted in the litigation in Kelly, which was decided in 1993. It then took six years, and I don't know why, but it took six years to negotiate settlement agreements between the taxpayers' partners of the partnerships the taxpayers were invested in and the IRS to come to those settlement agreements. The taxpayer's partner should have had incentive to settle those quicker. And you'll note that within one year of the settlement of those partnership settlement agreements, these liabilities were assessed. So the IRS and the underlying parties did what they could to move things along. But it's a practical matter. What's the taxpayer to do, pay the tax and sue for a refund? The taxpayer can pay the tax and also pay the interest and stop the interest liability. At the time the audit of the partnership starts, can they pay the tax and sue for a refund? And then you'd put the refund on the back burner until after you resolved your 18-year trek through the paperwork? The tax court has authority to determine that there's been an overpayment of tax. And then they would not have to file for a separate refund action. They could be, it could be given back to them on the basis of the tax court decision. Now, I'll grant you that at the time that an audit begins, all of the partners in a partnership are not notified. It's the taxpayer's partner who is notified. And it's his job or her job to notify the taxpayers that they have rights to join into the action and find out and act as much as they can. And the taxpayers here didn't do so. They have a right to be more involved. But the TAFRA proceedings have been upheld before and they're, they, it's the statutory mechanism that held things up in this case. There's no instance of any kind of delay on any part that they were just not pushing things forward. Now, there's no basis for negotiating these liabilities simply on the basis that there was a delay, period. The legislative history, the regulations say look to the circumstances. In the circumstances, if it promotes taxpayer compliance, then consider the offer in compromise. The regulations set out examples. If a man was ill, a taxpayer was ill in one year and didn't file a return, and several years later he gets a bill for a very high liability, and the, it's because the IRS went ahead and filed it and made a return for him and he shouldn't owe that liability. The regulation says that's a good case where you come in and you say, look, I had no idea about this. I was, I don't know, in a coma or something. And the regulation promotes such a settlement. These circumstances do not do that. If you look to the Beagles case, which the taxpayers cite in their brief, the Beagles case recites the history of what the tax, what Congress did to try to cut down on the tax court backlog in 1984. And one of the things it did was to institute a tax motivated transaction, higher interest. Why was that? It was to provide a disincentive for people to get involved in just these transactions that are at issue here. If they hadn't been involved in such complicated, and the Kelly courts found sham transactions, we wouldn't have this problem. And the high bill of interest here is a result directly of the fact that the higher rate of interest was applied because of the tax motivated transactions. Just briefly on the economic hardship issue, I believe that the tax court, of course, did not rule, did not err in its decision there. If collection would result in an inability to meet reasonable basic living expenses and compromise of the liability will not undermine compliance by taxpayers with the tax law, then a compromise on this basis can be had. And that's clearly not the evidence here. The evidence here is that they had assets of over a million dollars, that they had income every, at the time they filed their offer, of $140,000 a year. That was expected to continue. Their medical care costs in the future are purely speculative. They may happen, but they hadn't been incurred at the time, and what the exact nature and cost of the care was had not been established. There was no trial in this case to establish that certain things, anything different had happened, and so an economic hardship settlement is not justified. If the court has no further questions. Thank you. I have one brief question. Are both taxpayers still alive? Yes, they're both still alive, and Mr. Fargo is now in long-term. Is Dan still at Samar? Yes, he's in a home. Let me address a few of the points that were raised by opposing counsel. He mentions that he doesn't know why it took six years from the time of the Kelly case until the time the taxpayer's liability was determined. That's part of the problem. It's in the record that we requested, and the appeals officer at the time made some attempts to determine what the cause of the six-year delay was. And, in fact, all he got back was a little, was an answer saying it was, quote, in litigation. There was no reason that it should have taken six years from the time of the Kelly case. I think that, you know, the government says, well, it was the tax matters partner. Maybe he wasn't negotiating. There was nothing stopping the IRS from moving forward with the litigation. It didn't have to wait for the tax matters partner if there was delay. And I would point the court to the tax court's Jacobs case, which, again, is mentioned in the brief, which talks about delay under Section 6404. And in that circumstance, the tax court indicated that it was up to the IRS to come in and show what the causes for the delay were and that those causes were reasonable, because it's the IRS that's in control of this information. The taxpayer has no practical way of knowing if the IRS doesn't tell us what the cause of the delay is. Other causes of delay, and I think it's sort of interesting, opposing counsel indicated that, well, once these agreements had been signed, it only took the IRS a year to notify the taxpayers. Well, the reason it took them a year and the reason that they got there was because had they waited more than a year, then the statute of limitations was expired. So when the IRS is under a statutory deadline, it can move quickly. Another reason for the delay in this case prior to the Kelly case was because the IRS, and this is mentioned in the Beasley history, it explained that Norman Swanton, the promoter of this tax shelter, was under criminal investigation by the IRS. That delayed the determination in this case. In addition, apparently there was misconduct by Mr. Swanton at the original trial of the underlying case. There was some conversations with witnesses, I'm not sure exactly, but the case had to be retried. So this is a, you know, a very unusual case, and for the government to suggest, well, this was complicated, complicated facts, IRS had, I mean, the taxpayers got themselves involved in a two-tier shelter, and that's what took so long, I think the facts are otherwise. This is an unusual case. Going back a second to the economic hardship argument, the government mentioned $140,000 a year in income by the taxpayers. In fact, where the government is getting this number from is, there was an indication that on the taxpayers' 1999 return, they had adjusted gross income in that amount. The tax return is not in the record, and we don't know what that consisted of. What we do know is that by the year 2000, when they filled out the financial statement, they indicated their income was $100,000, and that didn't include any of their expenses. There was almost $6,000 in expenses listed on the financial statement, and again, that didn't include things like food, clothing, et cetera. So I know the IRS would like to paint these folks as rich taxpayers, they're not impoverished, but on the other hand, they do have substantial financial needs in the future. And to say that they're speculative or that there was no trial, I mean, I think it's very clear from the record that the taxpayers presented evidence of these future financial hardships, and there was never any contention by anyone at any stage that these contentions were untrue. And for the government to argue now, well, it's speculative, I suppose the future is always speculative, but there was a good deal of evidence in the record that was never, and there's no contrary evidence in the record. And if there are no questions, I'm going to wrap it up here. All right. Thank you, Counsel.
judges: Beezer, Hall, Wardlaw